IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | |
| | ) | No. 37724-5-III |
| REGGIE A. WILLIAMS, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| WENDY CHERYL WILLIAMS, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — When a party who represented themselves at trial hires a lawyer to appeal, the lawyer is sometimes tempted to advance a theory on appeal that the lawyer would have advanced at trial. But the client's evidence and argument at trial is not always a fit. That is the case here.

Through counsel, Wendy Cheryl Rowley[1] contends on appeal that the trial court erred by characterizing a home she inherited before marriage as community property, arguing that the legal documents she signed when she and Reggie Williams refinanced the home early in their marriage incorrectly stated that her purpose was to convert the home to community property. That was not her testimony and argument at trial,

---

[1] Ms. Rowley, formerly Wendy Cheryl Williams, asks that we refer to her as Wendy Cheryl Rowley.

however. Based on the evidence and arguments Ms. Rowley advanced at trial, no error is shown. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Wendy Cheryl Rowley and Reggie Williams married in 2003. They separated in July 2019 after nearly 16 years of marriage. Ms. Rowley, who was 58 at the time of trial, had been unemployed since February 2017, when she was laid off from a well-paying position at Inland Northwest Health Services (INHS). Mr. Williams, who was 62 at that time, was still employed as a driver for Terry's Dairy, a position he had held since before the marriage. Both Ms. Rowley and Mr. Williams brought separate property into the marriage. The only issue on appeal is the characterization of an inherited home that Ms. Rowley owned at the time the couple married and in which they lived during the marriage.

When Ms. Rowley was let go from her position at INHS, she collected unemployment until August 2017. She testified at trial that she applied for hundreds of jobs through 2018, but turned down some offers that she felt she could not perform given poor health. Mr. Williams contended at trial that Ms. Rowley turned down positions because the hourly wage offered, while close to what he earned, was considerably less than the salary she had earned at INHS.

Ms. Rowley's inability or unwillingness to work, and Mr. Williams's inability to sustain their lifestyle on his income alone, put a strain on the parties' marriage. Mr.

Williams moved out of the home on July 3, 2019, marking the couple's official separation. He commenced divorce proceedings in late August 2019.

Mr. Williams never disputed that Ms. Rowley inherited their home from her father and that it was her separate property when they married. He contended it had become a community asset by the time he petitioned for divorce. He agreed with Ms. Rowley that the home should be distributed to her, but contended that with the home on her side of the property division ledger, he was entitled to an equalization payment.

At trial, Mr. Williams was represented by counsel and Ms. Rowley appeared pro se. Ms. Rowley did not dispute Mr. Williams's testimony at trial that at the time they married, there was a mortgage on her home. Mr. Williams offered as evidence an excise tax affidavit signed by Ms. Rowley when the home was refinanced two years into the marriage. It was admitted without objection as exhibit P-20.

Unfortunately neither party designated the excise tax affidavit for inclusion in the record on appeal, but it was described by Mr. Williams as having been executed on January 19, 2005, and identified Ms. Rowley (then Williams) as the grantor and "Wendy Cheryl Williams and Reggie A. Williams" as grantees. Report of Proceedings (RP)[2] at 35. In oral findings, the trial court observed that the affidavit was signed under penalty of perjury and that "[t]here is an explanation in the document that lists the reasons for the

---

[2] All references to the report of proceedings are to the report of trial proceedings.

document was to allow the creation of the community property between both Mr. and Mrs. Williams." RP at 100-01. It was undisputed that the excise tax affidavit was executed in connection with a refinancing, and by the time of the July 2000 trial, title had been in both parties' names, with both liable on the mortgage, for over 15 years.[3]

At trial, Ms. Rowley never argued or testified that her intention in January 2005 had been only to change the title, not to transmute her separate property to community property. She often referred to the home as "my home" or "my inheritance," RP at 5, but on the issue of whether she intended to make the home community property in 2005, her testimony and argument consistently implied that she did.

She began her brief opening statement by saying, "So when marriage came up in 2000, I offered him my home, and everything went well until I got laid off." RP at 5. Mr. Williams testified first, and when Ms. Rowley was given the opportunity to cross-examine him she asked him, "When we got married, isn't it true that I offered you my home, my life, everything?" and he agreed that was correct. RP at 51.

When Ms. Rowley was called as a witness by Mr. Williams's lawyer, he directed her attention to the excise tax affidavit in the exhibit book, and elicited the following testimony from her:

---

[3] Temporary orders assigned responsibility for the mortgage to Ms. Rowley, who reached a forbearance agreement with the lender, so few payments were made following the parties' separation.

Q      [I]s that your signature at the bottom of the page?

A      Yes.

Q      Could you read the highlighted portion in the middle of the page?

A      I certify?

Q      Above that.

A      Explanation is given to create community property.

Q      Yes. So you combined your interest in the home; isn't that correct?

A      I'm not following your question.

Q      Well, you brought it into the marriage, so it was your separate property.

A      Correct.

. . . .

Q      Was it your intention at the time you signed this tax affidavit to make the house belong to both of you?

A      Yes, everything belonged to both of us when I got married.

RP at 73-74.

When given the opportunity to present her case, Ms. Rowley described maintenance of the home that she said "we" neglected. RP at 57. After listing needed repairs, she stated, "So all of those I feel would have to be addressed if Reggie gets any part of my home. That should be a shared expense." *Id.*

During closing arguments, Mr. Williams's lawyer stated,

> Regarding the house, these parties did everything they could to make that a community asset. They did the quitclaim deed; they specified a quitclaim deed.[4] A real estate excise tax affidavit intention was to make it community property. Furthermore, Mr. Williams not only was receiving the benefit of real estate ownership; he was also on the hook for the liabilities. His name is on the mortgage, so he does have liability for that. This should be a marital asset.

_____

[4] No quitclaim deed was offered as evidence.

RP at 92-93.

When it was Ms. Rowley's turn to sum up she did not respond to this argument, other than to say that a quitclaim deed had "not happened in our marriage." RP at 95. When questioned by the court about that, however, she seemed to admit that there had been a quitclaim deed:

> THE COURT: Did you see the real estate tax affidavit that he presented to the Court.
> MS. WILLIAMS: I understood that that was a separate item from the quitclaim deed. Maybe that's why but that's the way I read that.
> THE COURT: And you saw that with the quitclaim deed?
> MS. WILLIAMS: I did. Okay.

RP at 94-95.

Ms. Rowley did not argue in closing that her intention in January 2005 had been only to change title to the property, not to create community property. What she appeared to believe was important was that she had inherited the home, regardless of what happened in 2005. She also expressed her understanding that the fact that Mr. Williams, not she, "abandoned" the marriage was important to the property distribution decision. RP at 95. She also attached importance to the fact that she had been the primary breadwinner for most of the marriage.

The trial court treated the home as community property, reduced the value of the equity in the home by $15,000 in light of Ms. Rowley's testimony about deferred maintenance, and awarded the home to Ms. Rowley. In dividing the parties' other assets

and debts, the trial court allocated a disproportionate amount of credit card debt to Ms. Rowley in order to reduce the equalization payment she would owe Mr. Williams. It ordered Ms. Rowley to pay Mr. Williams an equalization payment of $55,627 by the end of the following January and explained that if she was unable to make the payment by refinancing the home, the home would have to be sold. It ordered Mr. Williams to pay spousal maintenance to Ms. Rowley for 12 months.

Ms. Rowley moved for reconsideration, which was denied. She appeals.

ANALYSIS

Ms. Rowley, now represented by counsel, argues on appeal that she "signed a quit claim deed at the request of her bank as part of a second mortgage." Br. of Appellant at 1. She argues that "apparently need[ing] money," the parties "signed up for a second mortgage on her house" and "[a]s part of that second mortgage, as is common, the wife had to sign a quit claim deed granting Mr. William's [sic] joint ownership of the home." *Id.* at 2. She argues that she testified at trial "that her husband 'never' actually owned 'her house' in her mind," and "she . . . thought the 'quit claim' deed was just a paper the bank had her sign to get the loan." *Id.* at 3. She argues that she thought "[t]hat deed was simply to accommodate [the parties'] new loan and did not transmute her property to community ownership." *Id.*

None of the quoted statements is supported by the trial record. Nor are these arguments that Ms. Rowley made in moving for reconsideration. Before she retained

7

counsel, Ms. Rowley's objection to the trial court's property division is best summed up

by a pro se motion filed with this court in September 2020:[5]

> Argument Why Review Should Be Accepted
>
> I have had my family home for 58 years. Reggie was invited into my family home expecting our marriage to be for a lifetime, growing old together. I was the bread winner for the 16 years we were married. My income allowed us to buy all the toys we wanted (within reason). We bought our fishing boat so we could enjoy it before we were too old to use it. In that process major items were neglected in my family home. Reggie harped on me that we needed a new roof for an easy year but then turned around and paid off the toys—boat and motorhome with his private investments instead of putting a roof on our house. He was setting up his abandonment of our marriage assuming he would get the toys, enjoying summer seasonal lake resort and leaving me all the maintenance, care and debt of my family home and bills. The court gave him all the toys.

Clerk's Papers at 368. The suggestion that Ms. Rowley only executed the 2005 quitclaim

deed because it was lender required was never asserted until counsel filed an opening

brief in December 2021.

As counsel correctly argues, once separate property is established, a presumption

arises that such property remains separate property absent direct and positive evidence of

intent to convert it to community property. *In re Marriage of Watanabe*, __ Wn.2d __,

506 P.3d 630, 634 (2022) (citing *Guye v. Guye*, 63 Wash. 340, 115 P. 731 (1911). A

spouse may execute a quitclaim deed transferring separate property to the community.

---

[5] No action was taken on the motion, which was filed before clerk's papers were designated or arrangements were made for transcribing proceedings in the trial court.

*Id.* at 635 (citing *In re Estate of Borghi*, 167 Wn.2d 480, 488-89, 919 P.3d 932 (2009)). But adding a spouse to a mortgage in order to obtain a loan does not *automatically* make the property community property. *Id.* (emphasis added) (citing *In re Finn's Estate*, 106 Wash. 137, 179 P. 103 (1919)). An alternative reason for adding a spouse to the title to real property can be that a lender or title company requires both parties to be in title as a condition to a loan. *Id.* at 636. A trier of fact presented with evidence of a lender's requirement for joint title may find that there was no intent to convert separate property to community property notwithstanding a quitclaim transfer to the community.

*Watanabe, Borghi* and related cases do not avail Ms. Rowley because the trial court was not presented with any evidence that Ms. Rowley's 2005 transfer of title was lender required. While it was established that the transfer of title coincided with a refinancing, the only evidence of the reason for the transfer presented at trial was the one expressed in the excise tax affidavit and admitted to by Ms. Rowley: to convert the property to community property.

Ms. Rowley nonetheless argues that the trial court's oral ruling explaining why it characterized the home as community property reflects legal error. She focuses on the trial court's highlighted statements below, which she argues do not reflect the analysis required by *Borghi*:

> [T]he Court has to look at what was the intent of the parties and your intent in sharing your home. It does show from the document presented that your home you intended to make it a community asset. You both lived in the

9

> home the last 16 years and with that document being created 14 years ago and the loan, the Court has no—I guess, *there's no law to support that this would be separate property, that the Court would only be able to categorize this as community property*.
>
> You did argue to the Court that house should be off the table it was your inheritance, *but the law says if you co-mingle your property, and you basically share it with the other party, it becomes community property. That means the value of the house, and any debt must be divided equally between the parties.*

RP at 101 (emphasis added).

Since Ms. Rowley did not take the position at trial that the 2005 excise tax affidavit mischaracterized her purpose and intent in transferring title, it was consistent with *Borghi* for the trial court to find that title was effectively transferred to the community. 167 Wn.2d at 488-89 ("With respect to real property, a spouse may execute a quitclaim deed transferring the property to the community."). We agree that "comingling" is not a concept we would apply in this context. But we suspect what the trial court had in mind was the related concept that even if Ms. Rowley presented evidence of an intent not to transmute separate property, the parties' payment of the mortgage with community funds for 14 years had consequences. It could require that an equitable lien in favor of the community be imposed on the property. *See, e.g.*, *Kuhnhausen v. England*, 79 Wn.2d 282, 286, 484 P.2d 1135 (1971).[6]

---

[6] As counsel knows but Ms. Rowley may not understand, the fact that she was the primary breadwinner for most of the marriage is irrelevant. Her earnings, like Mr. Williams's earnings, were community property in which the parties had an equal interest.

10

In any event, if the trial court misspoke in announcing its decision, it is irrelevant to the appeal. Substantial evidence supports the characterization of the home as community property.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Staab, J.